IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE BOARD OF EDUCATION OF THE :
APPOQUINIMINK SCHOOL DISTRICT, :
and THE DELAWARE DEPARTMENT OF :
EDUCATION, :
 :
                    Plaintiffs, :    C.A. No. 06-770-JJF
 :
       v. :
 :
MR. & MRS. SQJ, IV, parents of :
SQJ, V, :
 :
             Defendants. :

## REDACTED COMPLAINT

      Plaintiffs, the Board of Education of the Appoquinimink School District,

and the Delaware Department of Education, file this civil action seeking judicial review

from a decision of a Special Education Due Process Hearing Panel as follows:

### THE PARTIES

      1.    Plaintiff, the Board of Education of the Appoquinimink School

District (hereinafter "the District") is a public school district in the State of Delaware with

its central office located at 118 South 6th Street, Odessa, Delaware 19730. The District is

a "party aggrieved" by a final administrative decision pursuant to 20 U.S.C.A.

§ 1415(i)(2)(A).

      2.    Plaintiff, the Delaware Department of Education (hereinafter, "the

Department"), is a state agency responsible for overseeing public education in the State

of Delaware. The Department is located at the John G. Townsend Building, 401 Federal

Street, Dover, Delaware 19901. The Department is a "party aggrieved" by a final administrative decision pursuant to 20 U.S.C.A. § 1415(i)(2)(A).

3.    Defendants, Mr. & Mrs. SQJ, IV (hereinafter "Parents"), parents of SQJ, V (hereinafter "Student"), born 4/7/95, all of whom reside at 151 Back Creek Drive, Middletown, Delaware 19709, located within the Appoquinimink School District.

## JURISDICTION

4.    This Court has jurisdiction over this action pursuant to 20 U.S.C.A. § 1415(i)(2)(A).

5.    This Court has supplemental jurisdiction over the Delaware state law claims under Title 14, Chapter 31, of the Delaware Code pursuant to 28 U.S.C.A. § 1367.

6.    The Plaintiffs have exhausted their administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C.A. § 1400, *et seq.* and Title 14, Chapter 31, of the Delaware Code.

## STATEMENT OF FACTS

7.    Student is an 11-year-old child who is profoundly deaf and has attended the Delaware School for the Deaf, Margaret S. Sterck School ("DSD"), since the age of one. The DSD is a specialized school providing special education and related services to eligible deaf and hearing impaired children throughout the State of Delaware. Student's parents reside within the District.

8.    Student is identified as a student with a disability under the IDEA and Title 14, Chapter 31, of the Delaware Code. As a result, the District is responsible

2

for providing Student a free, appropriate public education ("FAPE"). The District must provide Student an educational program and placement tailored to Student's unique needs through an individualized education program ("IEP"). The IEP must be reasonably calculated to confer Student an educational benefit evidenced by educational progress and not regression or trivial educational advancement. The IEP must contain certain components, including a statement of Student's present levels of performance, a statement of measurable annual goals, and a statement of the special education and related services and supplementary aids and services he will receive. 34 C.F.R. § 300.320. In addition, the IEP must be developed collaboratively by an educational team consisting at least of a qualified District representative, Student's parents, a regular education and a special education teacher, and when appropriate, an individual who can interpret the instructional implications of evaluation results. 34 C.F.R. § 300.321(a).

　　　　9.　　The IDEA also requires children with disabilities be educated in the "least restrictive environment" possible. The least restrictive environment is a placement that, to the maximum extent possible, educates children with disabilities together with children who are not disabled. For deaf and hard of hearing students, a least-restrictive environment is intricately tied to communication and language needs. Because deaf and hard of hearing students face unique challenges, the IDEA and its implementing regulations require a child's IEP team to consider specific factors when determining the child's educational program and placement in the least restrictive environment. Specifically, an IEP team must consider a deaf child's language and communication needs, opportunities for direct communications with peers and

professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode. 20 U.S.C. § 1414(d)(3)(B)(iv); 34 C.F.R. § 300.324(a)(2)(iv).

10.     Each school year, Student's IEP team, including the staff from DSD, developed an IEP tailored to Student's specific areas of need. The staff at DSD have significant expertise in the education of deaf and hard of hearing students. Furthermore, DSD provides Student with ample opportunities for direct communication with peers and professional personnel in American Sign Language ("ASL") and also provides him with direct instruction in ASL. Student's parents, however, eventually disagreed with Student's IEP and continued placement at DSD.

## THE IEP IN DISPUTE

11.     On or about January 26, 2006, Student's IEP team convened and developed an IEP for Student to be implemented at DSD for the remainder of the fifth grade year (2005-2006) and the first half of the sixth grade year (2006-2007). Student's IEP included goals and objectives in the areas of reading, writing, math, and speech. Student's language and communication needs were addressed in his IEP. According to Student's IEP, Student must have opportunities for direct communication with peers and adults, direct instruction in ASL, staff trained to work with deaf students, and visual access to the environment.

## THE ADMINISTRATIVE PROCEEDINGS

12.    On or about April 11, 2006, Parents of Student requested a due

process hearing from the Secretary of the DOE.  Specifically, Parents alleged: (a) Student

failed to make meaningful educational progress in the areas of reading comprehension

and reading, (b) Student's IEP was not reasonably calculated to provide meaningful

educational progress, and (c) Student's educational placement at DSD was not the least

restrictive environment, nor the appropriate placement for Student's.  As a remedy,

Parents requested Student be placed at St. Anne's Episcopal School at public expense

with an ASL interpreter, and Student be awarded compensatory education services, as

well as attorneys' fees and costs.

13.    The Department appointed a three-member administrative panel

consisting of an attorney admitted to practice in the State of Delaware, an educator

knowledgeable in the field of special education, and a lay person with a demonstrated

interest in the education of students with disabilities.  14 *Del. C.* § 3137.

14.    On August 1, 3, and 15, 2006, a due process hearing was held to

determine whether the District provided Student a FAPE for the time period in question,

and if not, whether Student's private placement at St. Anne's School with public funds

was the appropriate remedy.  The Panel heard testimony from several witnesses, received

hundreds' of pages of documents into evidence, and received oral argument from all

parties.

15.    On September 20, 2006, the Panel issued a unanimous decision

concluding Student's IEP provided him a FAPE and met the requirements of the IDEA

059265.1028

(hereinafter, the "Panel Decision"). The Panel found Student's made reasonable progress at DSD and performed quite well. The Panel also recognized that there are inherent benefits from Student's attending DSD as a specialized school offering a program and placement tailored to students with Student's particular disability. The Panel found Student's educational program and placement at DSD provided him with significant learning and would continue to do so. Because the District provided Student a free, appropriate public education, the Panel correctly determined the District is not required to pay for his education at St. Anne's School. Rather, the Panel found that the decision to place Student at St. Anne's School for his education was a unilateral decision made by his parents for which the District is not responsible. The Panel properly determined the District provided Student a FAPE, and the administrative record supports this finding. A true and correct copy of the Panel's final Decision and Order is attached hereto as Exhibit "A."

      16.    Despite its determination that the District "provided and offered a Free and Appropriate Education to Student " and that "[t]he parents' placement [of Student at St. Anne's Episcopal School] is thus a unilateral placement," the Panel nonetheless held that the District was responsible for funding the provision of an ASL sign language interpreter as a related service "[i]n the rational exercise of discretion" and further, that this "liability continues over the parents' unilateral placement." (Exhibit A at 26). In so holding, the Panel exceeded its authority and arbitrarily determined that the District is required to provide an ASL interpreter in a private school setting.

17.    Because the Panel concluded the District provided Student a FAPE, Student is considered a parentally placed private school student under the IDEA. Parentally placed private school children have no individual right to receive some or all of the special education and related services the children would receive if enrolled in a public school. 34 C.F.R. § 300.137(a).

18.    In addition, under the IDEA, Plaintiffs have no obligation to fund any of the costs of Student's education at St. Anne's Episcopal School, including the costs associated with related services, because the District made a FAPE available to Student, and Parents, elected to place him in a private school. 34 C.F.R. § 300.148(a) ("This part does not require an LEA to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a FAPE available to the child and the parents elected to place the child in a private school or facility").

19.    In this civil action, the District and the DOE challenge the Panel Decision with respect to its specific ruling the District should provide an ASL interpreter to Student while he attends St. Anne's School as a parentally placed private school student.

## RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants for relief as follows:

For an Order reversing the Panel Decision's ruling that the District fund the costs associated with the provision of ASL interpreter services (or any other related service) to Student at St. Anne's Episcopal School (or any other parentally selected private placement).

YOUNG CONAWAY STARGATT
& TAYLOR LLP

_____
Scott Holt, Esquire (Bar ID 3399)
Michael Stafford, Esquire (Bar ID 4461)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19899
Phone: (302) 571-6623, 6553
sholt@ycst.com; mstafford@ycst.com

DATED:        January 24, 2007

DEPARTMENT OF JUSTICE


/s/ Jennifer L. Kline
Jennifer L. Kline, Esquire (Bar ID 4075)
102 West Water Street
Dover, DE 19901
Phone: (302) 739-7641
Jennifer.Kline@state.de.us

8

**REDACTED EXHIBIT A**

## DELAWARE DEPARTMENT OF EDUCATION

## SPECIAL EDUCATION DUE PROCESS HEARING PANEL

| | | |
|---|---|---|
| ██████████████████, on behalf of<br>██████████████████, | )<br>)<br>) | |
| Petitioners, | ) | DE DP 06-11 |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | )<br>) | |
| and | )<br>) | |
| DELAWARE DEPARTMENT OF EDUCATION, | )<br>) | |
| Respondents. | ) | |

### <u>OPINION AND ORDER OF THE DUE PROCESS HEARING PANEL</u>

Date of Petitioner's Application: April 11, 2006

Original Hearing Date: June 5, 2006

(Continued at request of both parties)

Date of Hearing: August 1, 2006, August 3, 2006 and August 15, 2006

Submitted: September 5, 2006

Decided: September 20, 2006

For Petitioner: Patricia M. O'Neill

For Respondent Appoquinimink School District:
Young, Conaway, Stargatt and Taylor, LLP, by Scott A. Holt and Michael P. Stafford

For Respondent Delaware Department of Education:
Jennifer L. Kline, Deputy Attorney General

Panel:                    Laraine A. Ryan, Esquire
                          William McGlumphy
                          Judith Mellen

## SUMMARY OF HEARING DISPUTE

The parties dispute whether or not ███████████████████████████ current Individualized Education Program (IEP) provides him with a Free and Appropriate Public Education and whether, in the case of unilateral placement, the Department should provide an on-site sign-language interpreter for ███████ at a private school.

## STATEMENT OF DISTRICT POSITION AND MAJOR POINTS PRESENTED

The District's position is that ███████ IEP provides him with a Free and Appropriate Public Education, and that if it does not, the panel has the power to provide an equitable remedy out of the options presented, and that the District does not have the duty to provide an on-site sign language interpreter at a private school in the case of unilateral placement by the parents.

## STATEMENT OF PARENT POSITION AND MAJOR POINTS PRESENTED

The Parents' position is that the IEP does not provide ███████ with a Free and Appropriate Public Education, and that the District and the Department cannot provide a Free and Appropriate Public Education to ███████ without a private placement, specifically at St. Anne's School; and that if that is found not to be so, and the parents unilaterally place ███████ in a Private School, that the Public Agency is still responsible for providing a sign-language interpreter on-site at the private school.

## FINDINGS OF FACT

███████, was born on April 7, 1995. He was diagnosed as profoundly deaf when he was about one year old. He was enrolled in the Sterck School (Delaware School for the Deaf) on June 10, 1996. ███████ continued at that school through the fifth grade, which he completed at the end of the 2005-2006 school year.

The Margaret S. Sterck School, Delaware School for the Deaf (DSD) provides an educational program for deaf and hard of hearing children, from birth through twenty-one years of age. The program includes preschool through high school education. The DSD staff includes teachers, paraprofessionals, speech and language therapists, school psychologists, and educational audiologist, educational interpreters, a school nurse and residential advisors. The Christina School District curriculum and state content standards are used in the development of the Individualized Education Program (IEP). Based on the individual needs of students, DSD implements a mainstreaming program in which students are accompanied by educational interpreters to classes in other schools within the Christina School District or New Castle County Vocational School District.

The DSD uses the same material as regular classes for each grade level. Though there is an inherent reported disadvantage in reading for the deaf, there is no attempt to revise each grade's curriculum to reflect that. In math and science, this is especially the case. In reading or subjects that require more reading comprehension, the small class size and the teachers' special training in learning for the deaf appears to make it possible for each child to move along at his own pace and advance as far as possible. The school records show that some of the students read on their own grade level in spite of their deafness, while others fall behind, though such lag could exist for non-deaf students.

DSD has an after-school literacy enrichment program. It has a sports program, through which it competes regionally with other schools for the deaf.

The records show that ███████ is highly motivated to learn. He goes the extra mile and does more than is required. His report card for grade four shows As and Bs. The Parents

3

suggested and the staff agreed to have him work at an Accelerated Reading Program. His scores on the reading tests went up after he undertook that program.

At an IEP meeting on November 9, 2005, the IEP team (which includes the parents) discussed options for ▓▓▓▓▓ placement for the next (2006-2007) school year. Class sizes and mainstreaming were among the issues discussed. ▓▓▓▓▓▓▓▓▓▓▓▓▓ (the Parents) wanted to have ▓▓▓▓▓ mainstreamed to regular classes, and due to concerns about class sizes and ability of peers in the classes that the public middle schools would involve, requested that an American Sign Language (ASL) Interpreter be provided in a regular, mainstream classroom of a private school, St. Anne's Episcopal School, rather than one of the public schools. St. Anne's class sizes are smaller than those of the public schools, and do not include peers with other types of disabilities, as do the smaller classes that would be available in the public schools.

After that meeting, the parents learned that the Appoquinimink School District (Appoquinimink) would provide ▓▓▓▓▓ with an ASL interpreter if he attended regular, mainstreamed classes in one of the public schools, but not if he attended such classes at a private school. The parents wrote a letter, dated December 19, 2005, to the Supervisor of Special Education Services, Special Education Office of the Appoquinimink School District, requesting clarification on why this decision had been made.

The Supervisor of Special Education Services wrote a letter to the parents, dated January 20, 2006, confirming that Appoquinimink would provide ▓▓▓▓▓ with an on-site ASL interpreter at a public school within the district, but it would not provide an on-site ASL interpreter for him at St. Anne's Episcopal. The reason for this decision, as stated in this letter, is: "Under the law, parentally placed private school children with disabilities do not have an

4

individual right to receive some or all of the special education and related services that they would receive if they were enrolled in the public schools."

Many deaf students are mainstreamed or partially mainstreamed. There is a lack of direct access to the material, since it comes through an interpreter. There is a lack of direct communication with hearing peers. However, there is also a balancing effect in that the deaf student learns to get along in the hearing environment, a preparation for post-school life, which must of necessity take place in the hearing environment. Therefore, when DSD students reach middle school or high school age, they are put in regular classes to the extent possible for each individual.

The IEP of February 17, 2006 lists ████████ strengths: respectful, responsible, completes homework, persistent, focused, motivated, retains vocabulary, understands concepts discussed in American Sign Language (ASL), good non-verbal problem solving, speed-reading familiar material; strong desire to learn, strong ability, quick learner.

His concerns and needs are listed: spelling, written English, reading comprehension, math computation and problem-solving, speech reading and spoken English. His areas of improvement are multiplication facts; and in the area of speech/language, he is more relaxed, flexible, confident, and willing to admit he doesn't know.

"Ability to generalize" is listed as a "concern and need" and the "accommodations, modifications, supports and services" applicable to this are the use of vocabulary in all classes and group discussions. For the concern regarding performance anxiety, the answer is to give extra time to get ready to answer.

The next list of concerns and needs: visual access to the environment, staff trained to work with deaf/hard-of-hearing students, opportunities for direct communication with deaf peers

and adults, small class size and placement with peers of the same or above age, ability and academic level. It is noted: "DSD provides these comprehensive services."

The Parents filed their request for a due process hearing on April 11, 2006. In it, they point out that ▇▇▇▇ does not have any learning disabilities, and that all testing has shown ▇▇▇▇ to be of average to above average intelligence. They assert that the IEP provides that ▇▇▇▇ needs access to education through American Sign Language, a small class, and a school setting with students who are at or above grade level. The options in the public schools fail this in that they provide for classes too large (30 students) or classes that are small but contain students who are below-level academically. The Parents suggest St. Anne's School as a solution to the problem; it has small class size and a chance for ▇▇▇▇ to advance at the same rate and level as his hearing peers; all that is necessary is access to the class material through the ASL interpreter. Since the District is willing to expend the cost for an ASL interpreter for ▇▇▇▇ in the public schools, there would be no cost difference for the ASL interpreter to be available to ▇▇▇▇ in the private school.

## MAJOR POINTS OF LAW RELATED TO THE CASE

### Free and Appropriate Public Education

The School District must prove by a preponderance of the evidence that it has provided the student with a free and appropriate public education. If the Due Process Hearing Panel cannot determine that it was more likely than not that the School District provided the student with a free and appropriate public education, it must decide in favor of the Petitioner. *Kruelle v. New Castle County Board of Education*, 642 F.2d 687, 692 (3rd Cir. 1981); 20 USC § 1415(e)(2).

6

Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State. 20 *USC* § 1412(a)(10)(B).

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility. 20 *USC* § 1412(a)(10)(C).

This means that a private-school placement at public expense is only for the situation where the local educational agency does not have any facilities for providing a Free and Appropriate Public Education to the child with a disability and resorts to one it can locate in a private school.

This is reflected under Delaware law:

**14 Del. C. § 3124. Private placement with financial aid.**
(a) Private placement with financial aid shall be granted only to a "complex or rare" disabled person defined as a person in the chronological age group 3 through 20 years inclusive, who is found to suffer from 2 or more of the defined disabilities, or who is so severely afflicted by a single disability, that the total impact of the condition means that he or she cannot benefit from the regularly offered free appropriate public educational programs. The determination shall be made by a committee appointed by the local board of education for identification, placement, review and dismissal of disabled persons and by the Department of Education that no school district or other state agency has a suitable free and appropriate program of education for the particular person. Such private placement shall be in a school/institution approved by the Department of Education. The Department shall make the final determination concerning the designation of a person eligible under this definition.

████████ disability is not complex or rare. It is not complex in that he has only one disability, deafness, and no other learning disabilities in addition. Deafness cannot be said to be so rare that it cannot be handled in the public schools, especially where there are enough deaf students to justify having an a single school that is especially for deaf students. The DSD not only exists, it has programs especially tailored to deaf students.

In determining whether FAPE was provided, the court must determine whether the school district followed procedural safeguards of IDEA, and whether the school district developed an IEP reasonably calculated to provide educational benefit. The school district does not have to provide the maximum possible benefit. *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982). Individualized educational programs under IDEA must provide significant learning and confer meaningful benefit. *Ridgewood Bd. of Educ. v. N.E.*, 172 F. 3d 238 (3d Cir. 1999). In *Ridgewood*, the Third Circuit held that an IEP must provide significant learning and confer meaningful benefit, and that benefit must be gauged in relation to the child's potential.

Respondent made a Free and Appropriate Public Education available to ████████. In fact, it has a special school for students with ████████ particular disability, the DSD. ████████ has made reasonable progress at this school and in fact has done well. The DSD has a specialized program for deaf students, and that program has given ████████ more than a trivial benefit. It has provided him with significant learning and could continue to do so.

Both parties initially appeared to agree that now that ████████ has reached middle school, he is best served by being "mainstreamed," that is, attending regular classes with access to the material through an ASL interpreter. The Parents believed that this was the only issue; where full time mainstreaming for ████████ would take place. To the Parents, it was apparently first

mentioned at the hearing that there is an issue about whether or not ▇▇▇▇ should be mainstreamed full time, or at all.

Thus, the dispute appears broadly as only between full time inclusion in the mainstream in the Appoquinimink public middle schools versus full time inclusion in the mainstream in the private school Parents have chosen. The issue of which of Appoquinimink's middle schools would be best was presented in terms of options the District offered.

Though ▇▇▇▇ might ideally do better at St. Anne's due to its smaller class sizes, he would still gain an education of significant benefit in the larger classes at the public middle schools or at DSD or a combination of the two. The smaller sized class with children with other disabilities would not be appropriate, because ▇▇▇▇ does not have disabilities other than deafness.

Given this finding, we have no issue of what equitable remedy might be fashioned. The dispute is not over what is a free and appropriate public education within the school district, but whether there should be a private school placement. The Parents argue for a private school placement, not for some variation of placements within the private school. The Parents testified that the issue had never been framed in terms of options within the district except that ▇▇▇▇ would be attending regular classes rather than classes at DSD, and would need an interpreter, and only whether or not the interpreter would be provided at a private school. Until the hearing, the District did not make communications to the Parents, at least not effectively, saying that full time mainstreaming was not appropriate for ▇▇▇▇; that he would be in regular classes all day was a given, the question was only at which of Appoquinimink's two middle schools it would take place.

9

***Related Services***

In the event that the parents make a unilateral placement of the child where the public agency has offered a Free and Appropriate Public Education, there is still an issue of whether or not related services will be provided; private school students receive related services in certain instances. Related services include interpreting services. 20 *USC* §1401(26)(A).

Since Parents choose a private school where Appoquinimink offers a free and appropriate public education in the public schools, their placement of ▆▆▆▆▆ in a private school is a unilateral placement.

This would end the inquiry, except that private school students are eligible for related services. There have been many cases involving these related services and whether or not they can be provided on-site at private schools.

Before the 1997 amendments to the Individuals with Disabilities Education Act (IDEA), the statutory and regulatory language was clearer (though "interpreting services" was not clearly stated as a related service in the earlier statute). At that time, the statute provided, as it does now, that as to children with disabilities voluntarily placed in private schools, states must "provide for such children special education and related services, to the extent consistent with the number and location of" such children in a state. *Russman v. Sobel*, 85 F.3d 1050, 1054 (2nd Cir. 1996)

The regulations of that time provided:

" [if] a child with a disability has a [free appropriate public education] available and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. However, the public

agency shall make services available to the child as provided under [various regulations]."
*Russman*, 1054-1055, citing the previous version of 34 CFR §300.403.

Before 1997, the various circuits held differently in cases where the issue was the provision of ASL interpreters, or other types of related services, such as one-on-one aides, which are effective only on a one-on-one basis (raising no economies-of-scale or on-site issues), mostly in favor of providing the interpreter or one-on-one aide.

The issue was, generally, that providing the interpreter on-site at a private sectarian school violated the Establishment Clause, and that therefore, the school district was actually prohibited from providing the interpreter. *Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). In *Zobrest*, the Supreme Court held that providing a sign language interpreter to a voluntarily placed private school student at a sectarian school did not offend the Establishment Clause, and that the school district was therefore not prohibited from providing the interpreter.

Once this issue was decided, whether or not federal law required the provision of one-on-one aides and sign-language interpreters to students unilaterally placed by their parents in private schools as related services available to private school children under federal law was argued in several circuits, not including the Third Circuit. The District of Delaware has not taken up this question either. Thus it is a case of first impression for us.

In the post-*Zobrest* cases, cases, school districts approached the issue from the opposite point: that the school district, while permitted, was not required to provide the interpreter.

<u>Case law providing that the school district must provide a sign language interpreter to a disabled student parentally placed in a private school</u>: *Cefalu v. East Baton Rouge Parish Sch. Bd.*, 907 F.Supp. 966 (M.D.La. 1995) held that IDEA requires school district to provide sign-

language interpreter for deaf student at parochial school; this case was remanded after the 1997 amendments; *Fowler v. Unified Sch. Dist. No. 259*, 900 F.Supp. 1540 (D.Kan. 1995) held that a school district was required to provide interpretive services for a deaf student at a private, non-sectarian school, but this case also was remanded; *Fowler v. Unified Sch. Dist. No. 259*, 128 F.3d 1431, 1436-7 (10th Cir. 1997).

Case law providing that the school district is not required to provide a sign language interpreter to a disabled student parentally placed in a private school: *Goodall v. Stafford County Sch. Board*, 920 F.2d 363 (4th Cir), *cert. denied*, 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991) held that where a school district offered to provide services to disabled students at a public school, the earlier version of IDEA did not require that the district make the services available to students at a sectarian school; *Goodall II* (1995) says that the court had held that way because it had found that to provide the interpreter would be a violation of the Establishment Clause; now that *Zobrest* overrules that, the Goodalls brought suit again but this time argued the decision not to provide a cued speech transliterator was a violation of the Free Exercise Clause, which the court held was not the case. *Goodall v. Stafford County School Board*, 60. F.3d 168 (4th Cir. 1995). (Goodall II).

*K.R. v. Anderson Community School Corporation*, 81 F.3d 673 (7th Cir. 1996) held that a school district had discretion under the IDEA to decline to offer a full-time instructional assistant to a student at a private school so long as such an assistant was offered to the student at the public school. *K.R. v. Anderson Community School Corporation*, 81 F.3d 673 (7th Cir. 1996). K.R. was a student with multiple disabilities who required a full-time assistant. Her parents had unilaterally enrolled her in a private school, even though they were told the school district would not provide an educational assistant if she attended the private school. The district court held

12

that the public school was obligated to provide the service and issued a permanent injunction and declaratory judgment in favor of K.R. The appellate court reversed, holding schools are responsible for the provisions of special education related services, but only to the extent consistent with the number of disabled private school children in the State. Where the public schools provide the necessary service at a public institution and give the disabled student a genuine opportunity to participate, the public school has discharged its obligation. Therefore, the court concluded that the IDEA and its regulations do not require a public school to make comparable provisions for a disabled student voluntarily attending private school.

The *Russman* case carried this question the farthest, finding in its original (pre-Amendment) decision that the school district was not required to provide the interpreter, but that it was not prohibited, either. The question was within the school district's discretion, which could not be exercised arbitrarily.

Before the 1997 Amendments: In *Russman v. Sobel*, 85 F.3d 1050 (2nd Cir. 1996), the Court of Appeals held that the IDEA required the school district to provide a disabled student with a consultant and aide at a parochial school. The student in *Russman* needed these two types of one-on-one aides. The Court reviewed *Cefalu, Fowler, Goodall* and *K.R. v. Anderson*, and reached the conclusion that while the IDEA does not require the on-site provision at private schools of any and all services that might be required in the context of public education, the statute accorded greater rights to disabled children voluntarily in private school than the *K.R. v. Anderson* case did. The *Anderson* case, the Court stated, accorded "excessive discretion" to school authorities to deny the on-site provision of services to disabled students in private schools. *Russman*, p. 1056.

13

The IDEA does afford the school district some discretion regarding on-site provision of special educational services at private schools. *Russman*, p. 1055. Public schools have discretion to devise the most efficient scheme possible for providing adequate special education and related services to a number of, but not necessarily all, private school handicapped children. (citation); though the public school need only offer a genuine opportunity for equitable participation to the private school students. (Citation). *Ibid.*

The *Russman* Court determined that the reference to "numbers" of students involved services to groups of students rather than individualized service. *Russman*, p. 1056. It gave the example of an occupational therapy. For example, if one occupational therapist can effectively aid five disabled students, in a situation with three therapists and fifteen disabled students, where there are fourteen disabled students at a public school and one disabled student at a private school, it is within the school district's discretion to offer occupational therapy only at the public school; in such a situation the school district is not required to provide an occupational therapist on-site at the private school, because of the higher cost-per-student. In this situation, the school district can take the position that it offers the private school disabled student occupational therapy only at the public school.

However, in the situation where there are three occupational therapists and fifteen disabled students, where there are five disabled students in the private school, nothing in the IDEA suggests that the public school authorities may limit the site of occupation therapy services to the public school. The public school authorities have discretion to deny on-site provision of services at private schools, but not just arbitrarily. For that discretion to be exercised in that fashion, there must be a reason, such as economy of scale. *Russman*, p. 1056.

"Where the cost of special services does not vary with where they are provided, the IDEA and regulations regarding voluntary private school students make little sense if such services may be made available only in the public school. The statue and regulations require that necessary services be provided to disabled private school students according to their needs, rather than the name of their school, (citation) and state that such services must be comparable in quality, scope, and opportunity for participation to those offered to public school students. (citation to 34 CFR § 76.654). *Russman*, p. 1057.

The *Russman* case at this point was still struggling with the Establishment Clause problem; there was an absurdity of result in that the school district had chosen to provide the student with the one-on-one aides, but only at a non-sectarian school two blocks away. The services were not as effective where the aide could not speak to the student's teachers or see her classroom and school, but the district had made a technicality of the matter and determined that it was unable to allow the aides it provided to physically set foot in the sectarian school.

The Court commented that if the school district could freely deny related services to a private school student, it would go against the principal purpose of the statute and regulations: to make a child's disability irrelevant to the family's choice of school, at least where there is no difference in the cost of provision. *Russman*, p. 1057. Since there was no cost issue, the aides being one-on-one aides, the two-block walk, or refusing to provide the aides, happened only because of the family's choice of school.

After the 1997 Amendments to the IDEA, the circuits considering the issue, and the remanded cases, appear to run to the conclusion that the services no longer have to be provided. Yet there is little about the change in the law that justifies this. In fact, the language of the new amendment is remarkably similar to the language used in the *K.R. vs. Anderson* case before the

15

Amendments. "Where the public schools provide the necessary service at a public institution and give the disabled student a genuine opportunity to participate, the public school has discharged its obligation." *K.R. v. Anderson, supra.* Providing the services has never been a requirement, but has been a part of the school board's discretion, and that is still the case.

Like the other similar cases, the *Russman* case was remanded. The same panel of judges found now that there was no requirement that the related services be required, and remanded the case down yet further for consistent proceedings. At that point, the Court did not address its earlier discussion on discretion. However, in cases arising in New York, the *Bay Shore* case makes this analysis perhaps unnecessary, because *Bay Shore* held the New York state law requires that the interpreter be provided. *Bay Shore Union Free Sch. Dist. v. T.*, 405 F.Supp. 2d 230, 241 (E.D.N.Y. 2005).

The case of *John T. v. Marion Ind. Sch. Dist.*, 173 F.3d 684 (8th Cir. 1999) is another case jumping the gun to interpret the 1997 amendments to mean that LEAs can go so far as to deny all services to all private school students. In that case, the provision of a one-on-one aide was required under applicable Iowa state law. After the amendments, the majority went so far as to undermine the greater entitlement under Iowa law to the point of considering the new federal law to trump that; the dissent points out that state law simply provides a greater entitlement not inconsistent with federal law.

After the 1997 Amendments to the IDEA, the statute says: " . . this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 *U.S.C.* § 1412(a)(10)(C).

16

The language states, as before, that there is no requirement that the local educational agency provide "special education and related services" to a child voluntarily placed in a private school. However, this is not new; so long as the local educational agency (LEA) has offered to provide a Free and Appropriate Public Education, whether in public school or in private if the school system in question has no proper facilities for it in its public schools, it does not have to provide "special education and related services" in a private school. This use of the conjunctive refers to the case where both are provided.

There is no longer any clear statement regarding the provision of related services alone. While that once was clear in the regulations, at least, the regulations so stating have been eliminated.

The regulations that apply:

### § 76.650   Private schools; purpose of §§76.651–76.662.

(a) Under some programs, the authorizing statute requires that a State and its subgrantees provide for participation by students enrolled in private schools. Sections 76.651–76.662 apply to those programs and provide rules for that participation. These sections do not affect the authority of the State or a subgrantee to enter into a contract with a private party.

(b) If any other rules for participation of students enrolled in private schools apply under a particular program, they are in the authorizing statute or implementing regulations for that program.

(Authority: 20 U.S.C. 1221e–3 and 3474)

### § 76.655   Level of expenditures for students enrolled in private schools.

(a) Subject to paragraph (b) of this section, a subgrantee shall spend the same average amount of program funds on:

(1) A student enrolled in a private school who receives benefits under the program; and

(2) A student enrolled in a public school who receives benefits under the program.

17

(b) The subgrantee shall spend a different average amount on program benefits for students enrolled in private schools if the average cost of meeting the needs of those students is different from the average cost of meeting the needs of students enrolled in public schools.

(Authority: 20 U.S.C. 1221e–3 and 3474)

### § 76.654  Benefits for private school students.

(a) Comparable benefits. The program benefits that a subgrantee provides for students enrolled in private schools must be comparable in quality, scope, and opportunity for participation to the program benefits that the subgrantee provides for students enrolled in public schools.

(b) Same benefits. If a subgrantee uses funds under a program for public school students in a particular attendance area, or grade or age level, the subgrantee shall insure equitable opportunities for participation by students enrolled in private schools who:

(1) Have the same needs as the public school students to be served; and

(2) Are in that group, attendance area, or age or grade level.

(c) Different benefits. If the needs of students enrolled in private schools are different from the needs of students enrolled in public schools, a subgrantee shall provide program benefits for the private school students that are different from the benefits the subgrantee provides for the public school students.

(Authority: 20 U.S.C. 1221e–3 and 3474)

### § 300.403  Placement of children by parents if FAPE is at issue.

(a) General. This part does not require an LEA to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility. However, the public agency shall include that child in the population whose needs are addressed consistent with §§300.450–300.462.

### § 300.452  Provision of services—basic requirement.

(a) General. To the extent consistent with their number and location in the State, provision must be made for the participation of private school children with disabilities in the program assisted or carried out under Part B of the Act by providing them with special education and related services in accordance with §§300.453–300.462.

(b) SEA Responsibility—services plan. Each SEA shall ensure that, in accordance with paragraph (a) of this section and §§300.454–300.456, a services plan is developed and

implemented for each private school child with a disability who has been designated to receive special education and related services under this part.

§ 300.454  Services determined.

(a) No individual right to special education and related services. (1) No private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.

(2) Decisions about the services that will be provided to private school children with disabilities under §§300.452–300.462, must be made in accordance with paragraphs (b), and (c) of this section.

(b) Consultation with representatives of private school children with disabilities—(1) General. Each LEA shall consult, in a timely and meaningful way, with appropriate representatives of private school children with disabilities in light of the funding under §300.453, the number of private school children with disabilities, the needs of private school children with disabilities, and their location to decide—

(i) Which children will receive services under §300.452;

(ii) What services will be provided;

(iii) How and where the services will be provided; and

(iv) How the services provided will be evaluated.

(2) Genuine opportunity. Each LEA shall give appropriate representatives of private school children with disabilities a genuine opportunity to express their views regarding each matter that is subject to the consultation requirements in this section.

(3) Timing. The consultation required by paragraph (b)(1) of this section must occur before the LEA makes any decision that affects the opportunities of private school children with disabilities to participate in services under §§300.452–300.462.

(4) Decisions. The LEA shall make the final decisions with respect to the services to be provided to eligible private school children.

(c) Services plan for each child served under §§300.450–300.462. If a child with a disability is enrolled in a religious or other private school and will receive special education or related services from an LEA, the LEA shall—

(1) Initiate and conduct meetings to develop, review, and revise a services plan for the child, in accordance with §300.455(b); and

19

(2) Ensure that a representative of the religious or other private school attends each meeting. If the representative cannot attend, the LEA shall use other methods to ensure participation by the private school, including individual or conference telephone calls.

(Authority: 1412(a)(10)(A))

Our reading of 34 *CFR* § 300.403 indicates that related services are still separate and can be provided alone; the statute refers only to the case where, in the conjunctive, Congress refers to cases where the education itself is undertaken in the private school, and the related services are merely an adjunct.   Otherwise, the 1997 Amendments would have arbitrarily made the parents' choice of school an issue and allowed the school districts to impinge on that choice where the parents could pay the private, even sectarian school tuition, thus not requesting the special education itself from the district, but could not afford related services.  The IDEA has never had an intent of this kind, and if the 1997 Amendments were to have created such an anomaly, then Congress would have stated it more clearly, at least using "or" rather than "and."  Such a distinction would have created other troubling issues regarding equal protection of the laws. Rather than create such an issue, Congress instead seems intent on reassuring school districts that they need have no Establishment Clause concerns where a sectarian private school is concerned; and that they don't have to do it if there are budgetary concerns or economies of scale to consider.

This is also reflected in the regulations then adopted:

### § 300.403  Placement of children by parents if FAPE is at issue.

(a) General. This part does not require an LEA to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility. However, the public agency shall include that child in the population whose needs are addressed consistent with §§300.450–300.462.

20

This regulation does not reflect a situation where once the child is unilaterally placed in private school, no services are provided. The second sentence indicates that private school children do receive certain services, and the child is to be included in the population of students whose needs are addressed.

Thus, while the LEA is not required to provide related services, neither is it prohibited, and can do so in the exercise of discretion.

### Exercise of Discretion with Regard to Related Services

A state actor cannot have unfettered discretion. See, e.g., *Delaware v. Prouse*, 440 U. S. 648, 662-663 (1979). There must be some neutral criteria, which can serve to make the exercise of discretion rational. *Ibid.*

Discretion exercised with no statutory standard to channel the discretion by specifying factors to be relied upon result in an ultimate decision that is intrinsically arbitrary and uncontrolled. Excessive discretion fosters inequality in the distribution of entitlements and harms, inequality which is especially troublesome when those benefits and burdens are great; and discretion can mask the use by officials of illegitimate criteria in allocating important goods and rights *Schall v. Martin*, 467 U.S. 253 (1984).

Even where the statute does not give any standard other than discretion, the exercise of the discretion must be accompanied with some sort of rationale to show that it was not abused. This is to assure that the exercise of discretion is not "arbitrary and capricious," a decision accompanied with no rational explanation. *Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 932 (2d Cir. 2001).

The Supervisor of Special Education Services' January 20, 2006 letter states that Appoquinimink would provide ██████ with an on-site ASL interpreter at a public school within

21.

the district, but it would not provide an on-site ASL interpreter for him at St. Anne's Episcopal. The only rationale given is a restatement of the old regulation: "Under the law, parentally placed private school children with disabilities do not have an individual right to receive some or all of the special education and related services that they would receive if they were enrolled in the public schools." While this explains that there is no individual right, it does not explain why discretion is exercised to deny the interpreter at St. Anne's, while specifically stating that this service will be provided in the public schools.

The panel disagrees with the *K.R. v. Anderson* case; in KR II it is asserted that the LEA "reasonably exercised its discretion rather than eschewed its responsibility once K.R. chose to attend private school," by giving K.R. "a genuine opportunity to participate in the public schools." *K.R. v. Anderson*, 125 F. 3d 1017 (7th Cir. 1997) (KR II). There are no factors cited in K.R.; just the arbitrary exercise of the discretion to deny the services. Like the case here, the decision to deny the services seems based only on the concept of "we aren't required to, so we won't," a simple exercise of arbitrary power. This is the "excessive discretion" the *Russman* court criticizes, giving an LEA the ability to use the discretion to force the parents' choice of school. *Nieuwenhuis v. Delavan-Darien Sch. Dist. Bd. of Educ.*, 996 F.Supp 855 (E.D. Wisc. 1998) is a case decided by a District Court in the Seventh Circuit, duly follows *K.R.II*, coming to the similar conclusion indicating the exercise of discretion is excessive and unfettered, allowing LEAs to deny related service to private school children without explanation.

The intent of the "no individual right" language in the regulations is that the school districts be assured they are not required to provide services on-site if there are economies of scale or other reasons for requiring the private school students to travel to public schools to receive the services in question.

"Congress also made it clear (with the 1997 Amendments) that public school agencies are not required to pay the costs of special education services for a particular child [in private school]; States are required only to spend proportionate amounts on special-education services for this class of students as a whole." *Foley Special School District of St. Louis County*, 153 F.3d 863, 865 (8th Cir. 1998). "States must make a FAPE available to all who want it through the public schools. It must spend a certain amount of money to provide services to children in private schools, but it need not provide services to all private-school students who would otherwise be eligible. And it must have procedures in place to make it known to parents that the LEA stands ready to provide a FAPE, and that students in private schools may be eligible for some services. If a state complies with these requirements it will receive federal assistance."

In this light, the Amendments were only necessary to prevent a state from becoming ineligible for federal funding if it exercises its discretion not to provide the services in some instances. It does not give the LEA carte blanche to exercise its discretion in an arbitrary and capricious manner, however. The assertion that the 1997 amendments clearly change the situation to mean that private school students no longer receive any services whatsoever is a misunderstanding of the changes.

The language of the amended IDEA does not change the overall scheme. Though the main part of the statute no longer cites a distinction between public education and related services, it never did; while the regulations once better reflected the difference between "public education and related services" and a case requesting "related services" alone; that the child is still to be included in the population for which services are to be provided shows that it is still contemplated that private school children will sometimes receive services. Other amendments to the statute made it clear that an interpreter is considered a related service, something not clearly

23

stated in the prior statute.   If related services were no longer to be provided to private school children, there would no longer be any need to even define them as separate from "public education."

The change in the language regarding on-site services appears almost tailored to undo the absurdity in the *Russman* case, where the child had to walk a few blocks to meet with the one-on-one aide, for no other reason that to create a situation where the services were not provided "on-site" at the religious school. Most of the cases initially involved a challenge regarding the Establishment Clause. The courts in their holdings, and Congress in its attempts to amend statutory language, show a united intent that this not become an issue, and that provision of related services at a sectarian school, even on its premises, is not to be considered an Establishment of Religion that would prevent providing the child with those services.

The 1997 amendments in IDEA re-iterate financial proportionality considerations; that is, related services are to be provided as a proportion of federal funds. *Russman, supra.* This shows Congress' intent in the amendments is something other than simply allowing that related services no longer be provided in private schools; if Congress wanted to stop all provision of related services to private schools, it would have said they were not to be provided, not that they were not required but could still be provided. So long as the private school proportionate fund for related services is not exhausted, the local educational agency may provide the related services. Saying it is not required is a way of allowing the school district to retain its economic grounds for not providing them, as the examples in *Russman* illustrate.

The school district is not required to provide the interpreter as it might have been under earlier case law in other districts, but it still has discretion and must exercise that discretion in a rational, non-arbitrary manner. There are no Establishment Clause concerns (Respondent here

very properly has not raised them, given that the issue is settled by *Zobrest*). There cannot rationally be an issue of cost or economy of scale; this is a one-on-one service.

Thus it follows that the Respondent is not required to provide the interpreter, but may do so. Becoming a matter of discretion, which is not to be exercised arbitrarily, there is no rationale given for failing to provide the service on-site at the private school. This interpreter would be provided on site at the public schools, and is a one-on-one related service, therefore there are no economy of scale considerations. Having the interpreter go to St. Anne's rather than any of the public schools would not cost the district more. The interpreter could not carry out any duties for the benefit of any other children, whether in public school or private. It would be an arbitrary exercise of discretion to simply refuse to provide the interpreter on-site at St. Anne's simply because it is "not required" under the law. No reason is given and no exercise of discretion is carried out at all under that analysis.

That the right is not individual, but only collective, does not take away the fact that ████████ is still part of the collective. The provision of the interpreter is financially feasible within the collective, since the District is willing to expend the costs for an interpreter at one of the public schools. The fund is then, not so small that the interpreter's salary so profoundly affects the collective fund that it would create a financial crisis in the provision of related services to private schools.

**State Law**

While other states have statutes dealing with the question of providing related services to private school students (often merely re-iterating the federal regulations), the Delaware statute does not deal with the subject of related services separately. The only mention we have is:

**§ 3122. Identification and reporting of disabled person.**

25

Each school district shall be required to identify, locate and evaluate, or reevaluate, any person residing within the confines of that school district who is disabled, regardless of the severity of the disability, and who is in need of special education and related services. The Department of Education with the approval of the State Board of Education shall provide through rules and regulations that a practical method for carrying out this section be developed. The identification system so developed shall provide information concerning the time and method of the evaluation or reevaluation of the disabled person and shall indicate the training, education or related services he or she is receiving and the location of that training, education or related services. The system shall further indicate any instance in which the person is not receiving training, education or related services and the reason for that situation.
. .

Thus if a person who needs related services but is not receiving them is found, the system shall indicate "the reason for that situation," but there is no further guidance about what to do once we know the reason for it.

The Delaware statute does not contain much guidance, but it does at least use the disjunctive, so that related services are separately considered. There is at least an indication of a requirement that the reason for not providing related service be inquired into, indicating some need to exercise the discretion with reasoning factors, not just an arbitrary decision with no underlying basis.

## STATEMENT OF PANEL'S DECISION

Appoquinimink has provided and offered a Free and Appropriate Public Education to ███████. The parents' placement is thus a unilateral placement. In the rational exercise of discretion, Appoquinimink should provide a sign-language interpreter as a related service, and that liability continues over the parents' unilateral placement.

The panel is mindful of the fact that ████████ could return to the public school system and has these comments on his IEP: In the event of ████████ return to the Delaware School for the Deaf, his IEP must be amended to comply with statutory requirements and to form a more valid basis for his instructional plan. First among these would be the inclusion of measurable goals and

26

more specific actions to achieve those goals. Further, because of ███████ age, a transition plan should be established, and included within the IEP, to prepare ███████ to move into an intermediate educational setting within a public school district.

## NOTICE OF APPEAL RIGHTS

Any party aggrieved by the decision of the hearing panel may file a civil action in the Family Court. Such proceeding shall be initiated by the filing of a complaint within 90 days of the date of the decision. 14 *Del. C.* § 3142(a).

DATED: 4-20-06

_____
Laraine A. Ryan, Panel Chairperson

DATED:

_____
William McGlumphy, Educator

DATED:

_____
Judith Mellen, Layperson

27